Filed 12/19/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DELBERT A. BEAMES, | F075855 |
| Plaintiff and Appellant, | (Super. Ct. No. VCU-267649) |
| v. | **OPINION** |
| CITY OF VISALIA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Tulare County.  David C. Mathias, Judge.

McCormick, Kabot, Jenner & Lew, Nancy A. Jenner, for Plaintiff and Appellant.

Herr Pedersen & Berglund, Leonard C. Herr, Ron Statler, for Defendant and Respondent.

-ooOoo-

Plaintiff Delbert Beames obtained writ relief after a City of Visalia hearing officer ruled against him in a zoning dispute concerning a commercial property. His motion for attorney's fees under the Civil Rights Act of 1976 (42 U.S.C. § 1988 (section 1988)) was denied.

Beames argues that the denial of the fee motion was an abuse of discretion. We agree.

Beames's writ petition sought relief on the basis of procedural violations of the city's municipal code committed by the hearing officer at the hearing. But the petition also made a claim under the Civil Rights Act of 1871 (42 U.S.C. § 1983 (section 1983)), founded on the contention that the hearing officer's errors denied Beames due process of law under the 14th Amendment. Section 1988 authorizes an award of attorney's fees to a plaintiff prevailing in a proceeding to enforce section 1983.

The record is somewhat ambiguous about whether the trial court's decision to grant relief rested in any part on the section 1983 due process claim. Even if it did not, however, that claim was (a) not insubstantial; and (b) based on the same nucleus of operative facts as the municipal code violation claim.

Beames also requested an attorney's fee award under Code of Civil Procedure section 1021.5. This is California's "private attorney general" fee statute, which authorizes a fee award where the action "resulted in the enforcement of an important right affecting the public interest" and conferred a significant benefit on the public; the need for and burden of private enforcement make the award appropriate; and it would not be in the interest of justice for fees to be paid out of a damages recovery. Under the relevant case law these factors mean Beames should have received a fee award under section 1988.

Beames expressly abandons this claim on appeal, and we do not rule on it. As a result, we have no remark to make on whether the specific requirements of Code of Civil Procedure section 1021.5 are established by the record.

Long before the City of Visalia (city) began enforcement actions against Beames, it had begun the process of developing and enacting a comprehensive overhaul of its zoning ordinance. The possibility of including provisions in the overhaul to resolve the dispute with Beames, and at the same time solve a more general zoning problem affecting other businesses in the neighborhood, had been discussed among city staff before the hearing, and Beames himself had discussed it with city staff. It was because city staff did not disclose this link with the zoning overhaul to the hearing officer at the administrative hearing, and Beames's own references to it were disregarded or not understood—combined with the hearing officer's fundamental misunderstanding of his role—that the hearing officer believed erroneously that he had no choice but to uphold the city's order directing Beames to remove his tenant's business from his property forthwith, and impose the maximum penalty of $500 per day until this should be done. The hearing officer never heard of the possibility that Beames's use of the property could soon be legalized by the city's own action; and in any case, he was ignorant of his discretion to consider that or other information as a basis for continuing the hearing, modifying or vacating the enforcement order, or reducing or omitting the penalties. He thought that if the violation was undisputed, he was required to uphold the order to shut down the business immediately and impose the maximum daily penalty as requested by the city.

These errors on the part of the city and its hearing officer forced Beames to file his writ petition, and led to the city compounding the negative effects of this unnecessary litigation.

After the hearing officer ruled against Beames, but before Beames filed his writ petition, the city's planning staff had placed before the planning commission a

3

recommendation to consider including in the zoning overhaul a provision affecting Beames's property favorably to him and neighboring businesses similarly situated. After Beames filed his writ petition, but before the hearing on the merits, city staff had placed approval of the overhaul on the city counsel's agenda, including a provision that would convert the use on Beames's property into a conforming use. Beames filed a motion to stay the daily penalties that had by then reached $45,000. The legislative process moved along, but outside counsel for the city opposed this motion, insisting that the business must be removed from the property immediately or the penalties must continue accumulating. By the time of the merits hearing in the superior court, the city's counsel acknowledged that final approval of the zoning overhaul, including the provision that would legalize Beames's land use, was imminent, Beames would no longer be in violation, and the business would not have to be evicted. Further, the city's counsel admitted in open court that the daily penalties that had been requested by the city, approved by the hearing officer, and defended in litigation, had never been warranted, and promised that the city would waive them all. *But in spite of all this, the city never proposed any kind of compromise, pause or stay of the litigation to minimize costs in the case* even after its disclosures and admissions at the merits hearing virtually ended its case.

We reverse and remand for a determination of a reasonable fee.

## FACTS AND PROCEDURAL HISTORY

*Background Facts*

In 2016, the city was in the midst of a lengthy process of revising its zoning and subdivision ordinances. According to a memorandum to the city's planning commission authored by its principal planner, Paul Bernal, the city adopted a new general plan in October 2014. The city needed to update the zoning and subdivision ordinances comprehensively to conform to the new general plan. In 2015, the city selected a

4

consulting firm, Quad Knopf, to lead the updating process. The consultant, planning commission, and planning staff held a "Kick-Off" meeting on October 12, 2015, and six work session meetings were held from February 8, 2016, to July 25, 2016. Draft ordinances and maps were prepared and public outreach was conducted.

Beames purchased the property at 920 North Ben Maddox Way in Visalia in 2010. The property had a metal building on it that was about 50 years old. It had been used by a towing service from 2003 to 2005. From the time Beames bought the property until 2016, it was leased to a neighboring auto body and paint shop, which used it as a place to which it could tow cars. In January 2016, Beames leased the property to West Coast Towing.

Beames's use of the property was similar or related to other uses on the same block. These included a full service auto repair shop, an auto body and paint shop, and a business that performed sandblasting and powder coating services (i.e., stripping metal and refinishing it with powder coat, a type of baked-on finish).

The zone in which Beames's property was located was Shopping Office Commercial (C-SO in the city's system of coding). It is undisputed that a towing service is not a conforming use in this zone and that the property was in violation of the zoning ordinance. The other businesses just described also were not allowed in the zone; no enforcement action was taken against these, however. Beames believed the action taken against him probably originated with a complaint from a competing towing service.

*Administrative Proceedings Against Beames*

The city received a complaint or complaints about the zoning issue from someone on February 8, 2016. Jesse Villegas, a code enforcement officer, inspected the property, determined there was a violation, and mailed a notice of violation to Beames on February 10, 2016, ordering him to remove the towing business within 30 days.

5

On February 29, 2016, Beames went to the public counter at the city's planning division office and asked to speak to the planner in charge of the comprehensive zoning update. Bernal, the principal planner, came out and spoke with him at the counter. Beames wanted to know if the update might change the zoning on his property and solve his problem. Bernal said he could not predict whether any of the changes made would affect Beames's property in that way or at all, and encouraged Beames to attend future work session meetings. He also told Beames about a process called site plan review, which Beames could use before applying for a zoning change on his own. Through this process, planning staff could provide guidance and tell Beames whether the planning division would support an application for a zoning change. Bernal also told Beames about the next step, actually applying for a change in the zoning, called the zone text amendment process. Beames told Bernal he would apply for site plan review. Beames asked whether a pause in the enforcement process would be possible for six months while he attempted to organize support for a zoning change among the other property owners in the vicinity, a change of zone for a single parcel not being a lawful option. Bernal did not say such an arrangement was possible. Beames never made any application for a site review or a zoning change.

On June 8, 2016, Villegas returned to the property and ascertained that the nonconforming use was still present. The city issued an administrative enforcement order to Beames the next day. It stated that the use of the property violated the zoning ordinance and Beames was required to remove that use. It further stated that he then owed $2,929.23, consisting of $2,800 in administrative penalty fees and $129.23 for staff time. The order was to become final unless Beames requested an administrative appeal hearing within 10 days, after which the city would abate the violation and charge Beames the cost, impose additional penalties, or both.

Beames requested an appeal hearing. The hearing was set for July 27, 2016, and then rescheduled at his request for August 24, 2016.

In July 2016, Beames had another meeting at the planning division, this time with Bernal and his supervisor, Josh McDonnell. McDonnell told Beames his only options were to remove the nonconforming use or to apply for a site plan review and then for a zoning change. Beames said he could not get the neighboring owners together before the scheduled August hearing. As Beames recalled, McDonnell suggested that Beames seek to have the hearing delayed. McDonnell did not recall making such a suggestion, and Bernal did not remember the question of a delay in enforcement being discussed at all at this meeting.

The hearing officer at the administrative appeal hearing on August 24, 2016, was Kevin Tromborg. Also in attendance were Beames and four city employees: Villegas, Bernal, McDonnell, and Neighborhood Preservation Manager Tracy Robertshaw. Beames was not represented by counsel. A form filled out by or on behalf of the hearing officer indicated that an assistant city attorney was present, but the transcript does not show that he spoke.

Villegas recited the facts that he had inspected the property, issued a notice of violation, reinspected it, found the nonconforming use was still present, and issued the administrative enforcement order. Robertshaw asserted that if the enforcement order were upheld, new fines would begin to accrue at $500 per day beginning the day after the hearing. Bernal and McDonnell described the meetings they had with Beames the previous February and July, agreeing that they had never said or suggested Beames could have extra time to comply. Bernal mentioned that Beames had asked whether the comprehensive zoning update would affect his property, but "the [city council] did not

7

authorize the redesignation of his property along the Ben Maddox corridor."[1]  In response to a question from Tromborg, McDonnell stated that the only options for Beames were to remove the nonconforming use, obtain a change of zone for the area, or obtain a change in the definition of the existing zone to allow the use.

Beames said he wanted to delay the hearing for six months.  He said he had spoken with Quad Knopf, the consulting firm the city had used for the comprehensive zoning update, and wanted the extra time "so they can come up with a plan."  McDonnell averred that if Beames had applied for a rezoning as an individual, "that would certainly constitute grounds for [him] potentially continuing this hearing because there would be a discretionary and legislative action that is under consideration by the city," but no application had been received from him.

Despite the several references made to the zoning overhaul, the consulting firm working on it, and the prior discussions about whether it could help, no one actually explained the nature of the overhaul to the hearing officer.  No one described its possible bearing on the future status of Beames's property, or the city's intentions regarding the future of the neighborhood; and the hearing officer did not ask.  Instead, as just mentioned, Bernal simply said in connection with the overhaul that the city council "did not authorize the redesignation" of property in the Ben Maddox corridor—a remark that was literally true but misleading, since the planning division—including Bernal himself—was still working on the update at the time of the hearing and it would not be finally presented to the city council for approval for several more months.

---

[1]     The administrative record includes a letter written by Bernal describing his meeting with Beames in February 2016.  The letter describes Beames's inquiry about whether the comprehensive zoning update might cure his zoning problem and Bernal's answer that he could not "predict" whether that would happen.  Bernal referred to the letter in his testimony at the hearing, pointing out that it was part of the record before the hearing officer.

Tromborg told Beames the matter was "pretty straightforward." Rejecting any kind of delay, Tromborg elicited McDonnell's assent to the proposition that, other than Beames applying for and obtaining a rezoning on his own, there was not "any other option here, as far as moving forward for him to try to keep his [tenant's] business." "Those are the two options," McDonnell asserted. "I did not offer a six-month stay," he continued, implying that absent such an offer by him, no lawful course of action was possible but the two just mentioned. Once again, he did not mention the idea that the comprehensive update was still under consideration or that it could potentially regularize the whole collection of nonconforming automotive land uses in the neighborhood and render Beames's individual case moot.

The hearing officer and McDonnell thus agreed that, no rezoning having been obtained by the property owner, nothing could be done to prevent a random one among many similar and complementary businesses, chosen by an unknown complainant, from being snuffed out forthwith, and onerous daily penalties heaped on its landlord, because of zoning that would have eliminated multiple businesses in the neighborhood if enforced uniformly.[2]

Tromborg went on to explain his view that his "job here as a hearing officer" was limited to "mak[ing] sure that the City of Visalia has followed all of their processes and

---

[2]    Conceivably, Beames's property differed from the surrounding properties in some relevant way. For instance, it could be that the other nonconforming uses in the area were allowed because they existed continuously from before a prior zoning change that caused them to be nonconforming until the present, while Beames's property was devoted to the nonconforming use only after the prior zoning change; or it was nonconforming before but there was a gap afterward during which it was not nonconforming. But there is no indication in the record that any such factors were involved. The code enforcement officer's report did not indicate that any investigation of the history of the property's uses or zoning was involved. The officer simply went and looked at the property, saw what it was being used for in the present, and concluded that the use was inconsistent with the present zoning.

9

procedures and all their rules and regulations." He found that "they have followed all of their rules and regulations," suggesting that from this conclusion, a ruling affirming the city's code enforcement order followed inevitably. He stated, further, that "as hearing officer, I don't have the authority to—to remove the fees or the fines. The only thing I can do is justify them." He then found, "As far as I can tell today, their fees and their fines and the administrative costs are justified."

As it happens, the hearing officer's conception of his function was far removed from the role set out for him in the city's municipal code, which called for him to examine the matter from several sides and exercise judgment.

First, there was nothing to prevent him from considering whether a continuance might prove fruitful, and acting in accordance with his considered judgment on that point. Section 1.13.090(D)(3) of the Visalia Municipal Code expressly allows this: "The hearing officer may, upon request of the responsible party against whom a penalty is to be imposed, or upon request of the city, grant continuances from time to time for good cause shown, or upon his/her own motion." The municipal code also confers broad discretion on the hearing officer in his or her determination of whether and to what extent to uphold an administrative enforcement order. Visalia Municipal Code section 1.13.100(A) reads as follows:

> "Factors in Hearing Officer's Decision. The hearing officer may affirm the administrative enforcement order imposed by the city, reduce the penalty, amend the abatement order, or find that the imposition of the penalty or abatement order is not warranted or is not in the interest of justice and vacate the order. In making his/her decision regarding the administrative enforcement order, the hearing officer shall consider evidence presented by all witnesses, the seriousness of the violation, the responsible party's efforts to correct the violation, the injury or damage, if any, suffered by any member of the public, any instances in which the responsible party has been in violation of the same or similar code provisions in the previous three years, and the amount of city staff time which was expended investigating and addressing the violation."

Was there good cause for a continuance? In light of the long-standing use and its similarity to other uses in the immediate vicinity, would it have been in the interest of justice to reduce or eliminate the penalty, amend the abatement order, or vacate the administrative enforcement order in its entirety? Was it a serious violation to continue using the property as an automotive-related business after doing so unimpeded for years in an area full of automotive-related businesses? Were Beames's efforts to adjust his dispute with the planning department in person worthy of some consideration, although ineffectual? There is no evidence that any member of the public suffered injury or damage, that Beames was a recidivist violator, or that the $129.23 charge for staff time represented a major effort. The hearing officer's remarks indicate he was unaware that he had any responsibility for considering any of these matters or any authority to act on the basis of them.

The hearing officer ruled in favor of the city, upholding the enforcement order and approving the imposition of penalties of $2,800[3] plus $500 a day, commencing the next day and continuing until the improper use was removed. He stated that Beames could stop the accrual of fees by submitting an application for "a zone text change or a general plan update or whatever the City's policy is" the next day. "My ruling is in favor of the City in this [instance] and I find … the fees issued by Code Enforcement to be justified," he concluded. "Case is closed."

The decision was memorialized on a city form that had no space for findings of fact, even though Visalia Municipal Code section 1.13.100(B) required the hearing officer to set forth "the findings of fact supporting the determination" in writing. Instead, under the heading "Hearing Officer's Findings," printed on the form, the hearing officer checked a box labeled, "Guilty of violations," and wrote in citations of the sections of the

---

**3** A bill sent to Beames on August 15, 2016, showed that the staff costs of $129.23, plus the appeal fee of $100, had already been paid.

11

zoning ordinance Beames was determined to have violated.[4]  The order was dated August 24, 2016.

***Beames's Participation in Public Hearing and City Staff Response***

The planning commission held an initial public hearing about the comprehensive zoning update on October 10, 2016.  Beames and three other owners of property on Ben Maddox Way between Houston Avenue and Center Street spoke at the meeting.  They proposed that the area be rezoned.  The new zone could be Service Commercial (C-S), which would allow those owners' uses without a conditional use permit.  Alternatively, it could be Mixed Use Commercial (C-MU), and the list of uses allowable with a conditional use permit in that zone could be amended to include the owners' uses.  Mixed Use Commercial (without the amendment of the list of conditional uses) was already the new zone the planning staff had been recommending for the neighborhood.

---

[4]  The form is singularly unsuited to its purpose.  It gives the hearing officer the choice of finding the property owner "guilty" or "not guilty."  It refers to the property owner in several places as "violator," even on the line where the property owner is asked to place his or her signature.  And under the heading "Hearing Officer's Findings," there are only the "guilty" and "not guilty" boxes, and spaces into which to write the code sections the owner was accused of violating.  The form thus prejudges the individual exercising his or her right to contest governmental action by labeling him or her a "violator" in advance; it then tars the "violator" by describing him or her as "guilty" or not, even though the matter may involve only an alleged civil wrong, not a crime; and, by providing no room for findings of fact in the section labeled "Findings," it encourages the hearing officer to disregard the code's requirement that he or she make findings in writing stating the facts on the basis of which he or she exercised his or her discretion.

The first two of these peculiarities could conceivably bias the hearing officer—who need have no legal training—by applying denunciatory terms to the property owner at the outset.  The third makes it easy to find the property owner is "guilty" and a "violator"—easier than the municipal code intends—by freeing the hearing officer of the necessity of writing anything to support the result, which in turn frees him or her from the necessity of studying the factors the code says are relevant.  We do not mean to suggest these deficiencies by themselves could justify relief from a hearing officer's order, but there is no reason why the city should court future problems by continuing to use this form.

12

Staff analyses and recommendations concerning public input such as this were prepared by Bernal and presented at a planning commission meeting on November 14, 2016. In these written remarks, Bernal explained that the existing zone for Ben Maddox Way, Shopping/Office Commercial, had been in place for more than 20 years, but would not be used at all in the comprehensively updated zoning ordinance. Like the Mixed Use Commercial zone, the Shopping/Office Commercial zone did not allow "tow yards, powder coating services, or other similar heavy commercial uses." Consequently, "not allowing them now would be a continuance of existing policy."

Further, according to Bernal, the Mixed Use Commercial zone would be compatible with a general plan goal that "envisions the Ben Maddox Way corridor as a 'revitalization' area 'with offices, commercial uses, multi-family residential, and mixed use developments.'" But altering the definition of the Mixed Use Commercial zone to allow uses like Beames's with a conditional use permit would have the undesirable effect of making those uses allowable with a conditional use permit everywhere that zone is in place. Rezoning the area as Service Commercial was a poor alternative, as it would exclude "uses such as general retail uses, grocery stores, pharmacies, and specialty food stores, and would require that offices over 2,000 square feet obtain a conditional use permit." That would be incompatible with the general plan.

Bernal's remarks included mention of the fact that the existing towing business on Beames's property "was opened in violation of existing zoning" and the city was then endeavoring to enforce existing zoning there. But he did not point out that this use was typical in the area despite the zoning, or that the rezoning originally recommended as part of the comprehensive update could leave other similar businesses exposed to extinction. Ordinarily, established businesses that would no longer be allowed under a new zone are "grandfathered" by the normal rule that continuing nonconforming uses are lawful after a

13

zoning change. (See Visalia Mun. Code, § 17.40.060[5]; *Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 551-552.) But the towing business on Beames's property evidently was not regarded as a continuing nonconforming use from the prior rezoning 20 or more years ago, and the nearby businesses might not have been so regarded either. Bernal's analysis, and especially his remark about continuing existing policy, thus did not take account of the atypical way in which the neighborhood's reliance interests would be left unprotected after the proposed rezoning. His readers were left to infer that Beames and his neighbors were not responsible businesspeople attempting to preserve an industry that had been doing business in the neighborhood for years, but scofflaws looking for a loophole.

Bernal did, however, attribute weight to one argument made by Beames and his neighbors. "They pointed out that there are several existing older buildings along the corridor and if the zoning provided the certainty that these heavy commercial uses would be allowed, then there would be a greater likelihood that investments would be made to upgrade these aging sites." He "acknowledged" this point and agreed that amending the list of conditional uses in the Mixed Use Commercial zone to cover these types of businesses could "help increase the number of possible uses that these buildings could be used for." His ultimate conclusion was: "If the [planning commission] desires to increase the number of possible uses for older buildings on the Ben Maddox Way corridor, then Staff would recommend that 'Auto Repairs, Major' be added to the list of uses allowed with a conditional use permit (CUP) in the C-MU zone. This would preserve a possible viable use for the older metal buildings and the CUP could require site upgrades where they are needed."

---

[5] The Visalia Municipal Code is published online at https://www.amlegal.com/codes/client/visalia_ca/ [as of December 16, 2019].

14

*Merits Litigation and City Legislative Action*

According to a declaration submitted by Beames and his attorney with his fee motion, Beames was not represented by counsel until after the administrative appeal hearing. He consulted with several local attorneys, none of whom wanted to take the case. Finally, a few days after the November 14, 2016 planning commission meeting discussed above, he was put in touch with his current counsel, who filed his writ petition in the superior court on November 22, 2016.

The petition alleged that the city's actions violated the municipal code, and also violated section 1983 by denying Beames due process of law. The facts alleged in support of these claims were:

- The city chose arbitrarily to take enforcement action against Beames but none of the similarly situated property owners in the immediate vicinity.

- The code enforcement officials, the planning division, and the hearing officer proceeded against Beames in spite of his requests for delays and continuances, never taking account of the likelihood that the planning commission and the city council would soon legalize Beames's use of the property.

- The hearing officer denied Beames's request for a continuance when there was no reasonable basis for denying it, and without stating any reasons for denying it.

- The hearing officer made no findings of fact.

- The hearing officer ruled against Beames without considering any of the factors specified in the municipal code.

- No substantial evidence was presented that would have supported the ruling even if the hearing officer had considered the relevant factors and made findings of fact.

- The hearing officer also was biased because, being an employee of the City of Corcoran, he volunteered as a hearing officer for Visalia while Visalia in return provided a hearing officer for Corcoran, and had an incentive to rule for the city to encourage it to continue appointing him. (Cf. *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1024-1025 [due process

15

violation where city's arrangement of appointing and paying hearing officers on case-by-case basis, with reappointment depending solely on city's goodwill, created risk of bias favoring city].)

- The hearing officer was biased in favor of the city because he worked as a code enforcement officer in Corcoran.

Beames soon followed up on the writ petition, filing on December 2, 2016, a motion to stay the operation of the hearing officer's order. The motion sought a stay pursuant to Code of Civil Procedure section 1094.5, subdivision (g), so that Beames would not be forced to choose between evicting his tenant and accumulating additional penalties at the rate of $500 per day while the litigation was pending. It contended that there was good cause for a stay because it would "ensure that [Beames] is afforded due process without incurring unnecessary penalties by simply seeking redress in" court.

The city's responses to the petition and motion to stay penalties were entrusted to its outside litigation counsel. In light of the circumstances we have described, it can fairly be asked whether, in thus passing the matter on, the city considered whether the litigation should be delayed or settled, in light of the city's impending need to make a decision on how to treat the neighborhood in the comprehensive zoning update, and in light of the recommendation planning staff had just made on that point at the November 14, 2016 planning commission meeting. And did counsel pause to consider how a delay or settlement might serve his client's interests? Did he believe those interests would be served by pursuing litigation sure to be costly to the city and its resident, even though the litigation might soon be rendered moot by the city's own pending legislative action? Under those circumstances, would it be in the city's interest to try to enforce penalties that could have reached $100,000 or more by the time the litigation had run its course— even though the city might be on the verge of resolving in Beames's favor the ultimate issue of whether his use of his property could continue? The record naturally does not

16

answer these questions; but what is clear is that the choice was made to contest the matter vigorously.

The city filed opposition to the motion for a stay on December 9, 2016. It claimed that a granting of the stay would be tantamount to abandoning the whole enterprise of land use regulation as a legitimate governmental activity. Further, the city claimed it would not be in the public interest within the meaning of Code of Civil Procedure section 1094.5, subdivision (g), because Beames had "knowingly violated the zoning laws for a long time," and wanted "permission to ignore the law, with absolutely no showing to justify" it. Disregarding the facts that it had long tolerated a collection of complementary auto-related businesses in the neighborhood despite the contrary zoning, had initiated enforcement action against only one owner only because unidentified persons had complained, and was at that moment considering regularizing the presence of all the businesses, the city attributed the existence of the nonconforming towing business on Beames's property to his "flagrant disregard for the public's interest in the regulation of land use." By seeking a stay that would stop the accumulation of penalties beyond $45,000 and delay the eviction of the business while the litigation was pending, Beames "ask[ed] this Court to remove him from the City's authority to govern and administer its laws." Beames's request for this temporary relief "undermine[d] the very notion that states can validly exercise their zoning authority through local governmental entities." "Why," the city rhetorically asked, "would any landowner bother paying attention to zoning rules if a violator can buy several months of consequence-free violations by renaming himself a 'petitioner'?" What Beames was really asking the court to do was "arbitrarily cap the cost of violation down so he can continue the violation without those pesky, increasing costs of his intentional, daily recidivism." If relief were granted, the floodgates would open and all future violators would be able to "buy themselves some time on the cheap" by moving for "a stay of enforcement on no showing." The motion

17

was "little more than a request that [the court] countenance ongoing and knowing violations of the law."

The court granted the stay on December 15, 2016. It observed that Beames had not yet proffered any evidence that would substantiate the claims in his writ petition, but determined that the public interest was not exposed to any of the dangers the city's opposition had described so colorfully. And the fact that the city was content to leave the nonconforming use alone for years pointed to a lack of urgency with which the potential hardship on the property owner was incommensurate:

> "Under the circumstances presented, the court cannot find granting a stay in this matter would disturb the public interest. It appear[s] that [the city] has delayed some six years before investigating the use of the subject property and initiating its enforcement proceedings. Further delay for the month(s) needed to litigate this petition would not appear to adversely impact the public confidence in [the city's] zoning ordinance. The amount of the daily fine could result in significant financial hardship to [Beames] while he pursues his allowable … remedies."

Beames filed a motion for issuance of the writ on January 13, 2017. In a declaration supporting the motion, Beames made the point that the city's zoning update was underway. He declared that the process had begun in early 2016; that he had appeared before the planning commission with neighboring owners to support changing the area's zone to Service Commercial; and that the matter would next be considered at a public meeting on January 17, 2017. Beames stated that he had never applied for a rezoning as an individual because of this ongoing process.

The record contains the agenda for the city council meeting held on January 17, 2017. It included a public hearing on the introduction of Ordinance No. 2017-01, which was the comprehensive zoning update. As counsel for the city acknowledged at the merits hearing later, this proposed legislation, being offered up by the planning commission for enactment by the city council, included a provision that would, by itself, make Beames's use of his property lawful. (This, presumably, was because the final text

18

of the legislation rezoned Beames's area as Service Commercial, as he and his neighbors had requested, as it would authorize their uses without a conditional use permit.)

Nevertheless, the city carried on with the litigation by filing on January 20, 2017, its opposition to Beames's motion for issuance of the writ. The city's brief was premised mainly on the propositions that it was undisputed that the use to which Beames's property was being put violated the zoning ordinance, and that all the considerations raised by Beames were "minutiae" in light of this. The brief contained no acknowledgement of the fact that the city was even then in the final stages of the long process of drafting and approving legislation that, when passed, would allow Beames to continue the current use of his property.

At the next city council meeting, on February 6, 2017, the proposed zoning update ordinance received its first reading, still containing the provision to save the businesses on Ben Maddox Way. After the second reading, at the following city council meeting one month later, the ordinance would be adopted absent unforeseen circumstances.

At the hearing on the merits of Beames's request for writ relief, on February 9, 2017, counsel for the city conceded for the first time that legislation allowing Beames's property use was pending and would soon become law. Further, according to counsel, city staff realized long ago, while investigating the complaint against Beames, that the whole neighborhood around Beames's property had the same issue; at some point they began developing a solution to be included in the zoning overhaul ordinance. Yet the enforcement action against Beames continued up to and including the city's defense against Beames's writ petition being heard at that moment; and this was because Beames had never submitted an application for a zoning change as an individual.

In response, the court asked whether there was any difference between unlawful spot zoning and the spot *enforcement* that—by counsel's own account of events (i.e., the

city knew of neighboring improper uses but did nothing)—apparently had occurred in this case. Counsel answered: "I don't know."

Forced to confront these adverse realities, the city finally tempered its approach to this litigation. Counsel now claimed that the city had really never "levied or set a fine of $45,000," and had no intention of ever trying to collect, now that Beames's property use was going to be legalized. Beyond this, he conceded that the $500 per day penalty—which the city requested and obtained at the administrative hearing, defended zealously in response to Beames's motion for a stay, did not waive in its brief opposing Beames's motion to issue the writ, and never until that moment suggested it did not want—was unwarranted and should never have been pursued in the first place. "[I]t's appropriate to say those [daily penalties] are not supported by the record." "And I'll just represent to the Court that we stipulate that no 500-dollar a day penalty after the hearing should have [been], could have [been], or was actually imposed." "The only amount that has been put on the books, so to speak, against Mr. Beames to date is [$]2,800," counsel averred.

So the city's expectations at the time of the merits hearing were that Beames would not have to evict his tenant because the property use was about to become consistent with the zoning, and that no daily penalties could properly be upheld.

Yet it did not stand down. The court asked counsel for the city whether his concessions meant "much of this case" was moot. Counsel said "[n]o," but did not elaborate. The only part of the hearing officer's order that remained after these concessions, however, was the $2,800 in fines that had been imposed by code enforcement staff previously. Still the city never conceded that any part of the hearing officer's order should be overturned. It certainly never said it was now just fighting for $2,800.

20

The court took the matter under submission and urged the parties to try to reach a settlement before he issued a ruling. No settlement was reached, for $2,800 or otherwise, and the court issued a written ruling in favor of Beames on March 21, 2017.

The ruling rested on two points. First, the court concluded that the hearing officer had failed to understand and exercise the discretion the municipal code conferred on him as reviewer of the city's enforcement order. This amounted to an abuse of discretion in the form of a failure to exercise discretion or the application of an incorrect legal standard. (Code Civ. Proc., § 1094.5, subd. (b) [administrative tribunal abuses its discretion where it has not proceeded in the manner required by law].)

The hearing officer indicated he believed that since the violation was undisputed, his mandatory duty was to affirm the city's enforcement order in its entirety and impose the full amount of penalties the city requested, and that no findings other than the finding of a violation needed to be made. As we have said, this was far from correct, for the municipal code expressly granted him broad discretion to affirm, modify, or vacate the order, and reduce or eliminate the penalties, based on a set of factual determinations involving certain enumerated factors in particular, and the interests of justice in general, to be set forth by him in writing. The court stressed the hearing officer's failure to exercise his discretion specifically over modification or elimination of the penalties, but it could just as well have pointed to his failure to exercise his discretion in the matter of vacating the order or modifying it in other ways as well.

Second, the court concluded that the city could not properly take the benefit of a decision that might have been rendered, at least in part, because of its apparent failure to disclose crucial information. City personnel at the administrative hearing were personally involved in the comprehensive zoning update, had met personally with Beames and become fully informed about his situation, and had fielded his questions about whether the update could be used as a vehicle to regularize his property use and

21

that of his neighbors, all before the administrative hearing. According to remarks by counsel for the city at the merits hearing, city staff had become acquainted with the neighborhood's problem with nonconforming uses, and with the possibility of solving that problem as part of the comprehensive zoning update, all the way back at the time of the city's investigation of Beames's violation. The court wrote that it was not clear when, exactly, the city put into motion the solution that was on the brink of being adopted at the time of the merits hearing, but it found that the city "was at least contemplating a self-initiated zoning change for the subject property at the time of" the administrative hearing. But none of city's witnesses mentioned any of this at the administrative hearing, except to assert that when they spoke with Beames, they never agreed to any delay in enforcement. Instead, Bernal misleadingly implied that the city had already decided *against* any zoning change favorable to Beames, saying the city council "did not authorize the redesignation of his property along the Ben Maddox corridor." It was not possible for the hearing officer properly to exercise the discretion conferred on him by the municipal code as long as this information remained undisclosed to him by the city.[6]

The court summarized its conclusions and framed its order as follows:

> "Under the circumstances presented the court finds [Beames's] due process rights were not adequately protected in this proceeding. The hearing officer did not recognize the extent of his authority to modify assessed penalties, there was no statement of findings in the hearing officer's ruling from which this court could conclude the hearing officer considered factors applicable to the amount of the penalty assessment, and it appears [the city's] witnesses did not provide the hearing officer with

---

[6] This conclusion was not altogether consistent with the court's additional conclusion that the hearing officer correctly denied Beames's request for a continuance. Beames made it clear at the administrative hearing that he wanted a continuance so he could *work with the city's consultants on the comprehensive zoning update* in order to get his neighborhood rezoned as part of the update. If the city was at fault for failing to provide information on that topic, shouldn't the administrative hearing have been postponed based on Beames's request to develop the issue further on his own, as he requested?

22

additional relevant information regarding options available for curing [Beames's] zoning violation which may have impacted the hearing officer's decision as to the amount of penalties to be assessed in the interest of justice. For these reasons the court grants the Petition and orders a writ to issue directing [the city] to vacate the ruling of the administrative hearing officer dated August 24, 2016[,] and directing [the city] to hold a new administrative hearing in the event such is warranted in light of current circumstances."

In light of the remarks by counsel for the city conceding the impropriety of the daily penalties and acknowledging the impending legalization of Beames's property use, why did the court not go further and order any further proceedings before the hearing officer to be limited to the question of reimposing the fine of $2,800? Presumably, it did not do this because counsel for the city hedged when asked whether there was anything significant left for it to pursue, and because the city had not actually passed the updated zoning ordinance as of the time of the merits hearing. The reference to "current circumstances" at the end of the court's order was its way of taking account of those considerations.

In any event, there is no indication that another administrative hearing was ever held. It appears to be now undisputed that there is nothing left for the city to pursue and that its enforcement action has been abandoned. It also appears to be undisputed that the $45,000 penalty award was not in the interests of justice, that the city has no policy interest in removing the existing use from Beames's property, and, since it has been legalized, no power to remove it. Indeed there are no longer any grounds for disputing that the city *never* had any rational interest in removing the use or penalizing its non-removal while it was considering and then enacting zoning changes that legalized it. The period of that consideration and enactment encompasses the entirety of the time the city was defending in court its order to pay the penalty award and remove the use.

The city's actions contesting Beames's writ petition were of little legal value and generated unecessary expense. After November 14, 2016, the date Bernal formally

23

submitted to the planning commission his suggestion that it could adopt means of legalizing the automotive uses on Ben Maddox Way if it wished to maximize the economic potential of the older buildings there, there was literally nothing the city could rationally have wanted from litigating the case that it could not have had for free by agreeing to stay it while the legislative process played out (a process that apparently ended up taking only about four more months).[7] November 14, 2016, was a week *before* Beames filed his writ petition in the superior court.

The writ of mandate and the judgment were filed on March 30, 2017.

## Fee Litigation

Beames filed his motion for attorney's fees on April 28, 2017. It made two arguments. First, fees were awardable under Code of Civil Procedure section 1021.5. This statute authorizes an award of attorney's fees based on a "'private attorney general'" theory, i.e., the theory that the availability of an award of fees to a prevailing plaintiff is desirable to incentivize private enforcement of the law in the public interest by shifting the cost of that enforcement to the violator. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 929-931; *La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2018) 22 Cal.App.5th 1149, 1155-1156.) The statute authorizes the trial court to award attorney's fees to a "successful party" in "any action which has resulted in the enforcement of an important right affecting the public interest" (Code Civ. Proc., § 1021.5) when all of the following are true:

---

[7] There is one place in the record—the city's brief in the trial court opposing Beames's fee motion—where the city took the position that the original administrative order issued on June 9, 2016, was still in effect and therefore Beames would still owe the $2,800 unless there was a new hearing before the hearing officer and he vacated that order. This would be because, unlike the $500 daily penalty, the $2,800 penalty was in the original order, which remained in existence after the trial court vacated the hearing officer's order. But the prospect of recovering the $2,800 cannot have supported a rational desire to fund the litigation. The city obviously paid its attorney far more than $2,800.

"(a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons";

"(b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate"; and

"(c) such fees should not in the interest of justice be paid out of the recovery, if any." (Code Civ. Proc., § 1021.5.)

Beames contended that his success on the writ petition enforced the important public right to code enforcement hearings that afford due process. A significant benefit will be conferred on the general public if the city responds to its defeat by mending its ways. The remaining elements of Code of Civil Procedure section 1021.5 were satisfied because–as Beames claimed in his motion for award of attorney's fees–the city "dragged [him] through a relentless pursuit of penalties that were improper, improbable and which the City had to know were both legally and morally wrong."

Second, the motion made a claim for attorney's fees under section 1988. Section 1988 provides that a trial court has discretion to award a reasonable attorney's fees to a prevailing party in an action to enforce section 1983, among other statutes. (42 U.S.C. § 1988(b).) Section 1983 creates a civil cause of action against any person who, under color of state law, deprives any person of rights secured by the federal Constitution or a federal statute. (42 U.S.C. § 1983.) Beames argued that he established, and the trial court found, a 14th Amendment due process violation. This, in turn, was the predicate of a section 1983 violation, so Beames was a prevailing party to whom fees should be awarded under section 1988.

The city's opposition to the fee motion began by pointing out that the comprehensive zoning update process began before the litigation in this case, that it was discussed in public meetings, and that Beames attended some of the meetings and spoke at one in an attempt to include his and his neighborhood's issue in that process. There were no secrets.

25

It was unclear what point the city intended to be making with these observations. As discussed above, the facts that city planning staff engaged with Beames on the matter of regularizing his and his neighbors' property, and submitted to the planning commission a possible means of doing this through the comprehensive zoning update— and did these things before the writ petition was filed—is an indication that the city's right hand had declined to take notice of what its left hand was doing when it actively tried to enforce the cease-and-desist order and secure a judgment upholding the daily penalties. If something secret *had* been going on, and there were no lines of communication between those running the zoning update and those pursuing enforcement against Beames, the litigation misdirected at him might have been more understandable. Yet the city was oddly at pains here to emphasize that everything was done in the open and it litigated against Beames although it knew the process leading ultimately to the legalization of his property use had begun long before and was proceeding apace.

The opposition next contended that a fee award would be inappropriate under Code of Civil Procedure section 1021.5 because the interests vindicated by Beames's writ proceeding were not important, substantial, or public. In the city's view, the case involved trivial mistakes by the hearing officer affecting one parcel and owner only, and only $2,800 was at stake. Despite the hearing officer's order to pay $500 per day and the city's previous contention that a stay should be denied so the penalties could continue accumulating beyond $45,000 in order to protect the rule of law from avaricious landlords, the city now argued that there was "no evidence that [Beames] actually incurred" any daily penalties at all. This was proved, the city maintained, by the fact that it sent Beames a bill not referring to daily penalties on August 2, 2016—*before* the hearing officer ordered the daily penalties at the city's behest on August 24, 2016—and then sent him another copy of the same bill on September 13, 2016. This somehow put Beames "on notice that the fines were not aggregating," despite the city's later litigation

26

positions that they must continue aggregating and that the hearing officer's order awarding them to the city must be upheld in its entirety. The city's argument did not address the question of whether Beames's interest in not having to evict his tenant and stop using the property as he had been using it—which the hearing officer's order demanded and the city never backed away from until the merits hearing at the end of the litigation, when the rezoning game was all but over—was a substantial interest. It also did not explain why, if only $2,800 was at stake, it never offered to settle for $2,800 and leave Beames's property use alone.

Finally, the opposition argued that a fee award under section 1988 would be inappropriate. It averred that, despite the appearance of the words "due process" in the trial court's ruling, that ruling was really based only on the hearing officer's failure to follow the procedural requirements of the municipal code. There was no constitutional due process violation on which a finding of a section 1983 violation could have been based. And even if the hearing officer or the city's witnesses at the administrative hearing had committed a due process violation, the city would not have been liable for it. The city believed it could be liable for such a violation only if it was committed pursuant to an official policy of committing such violations within the meaning of the United States Supreme Court's holding in *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658 (*Monell*).

The court heard oral argument on the fee motion on June 1, 2017, and issued a written ruling denying the motion on June 5, 2017. The gist of the ruling was that the matter was too private and personal in character for a Code of Civil Procedure section 1021.5 award; and it was not important enough to implicate the federal Constitution even though there was a due process problem, so a section 1988 fee award was not appropriate either. Regarding the latter point, the court referred to (but did not cite) other California cases it had consulted in which state appellate courts had upheld section 1988 awards. It

27

stated: "The constitutional claims in the cases reviewed by the court involve basic constitutional issues at a level not [comparable to the level of the issue] considered here (whether an administrative hearing officer properly assessed fines and penalties on a zoning violation)."

Relying on *Monell*, the court also stated: "[A] local government may not be sued under Section 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom … inflicts the injury that the government as an entity is responsible under section 1983." (*Monell* is the authority under which, in section 1983 suits against local governments, courts deny relief to victims of police beatings where the beatings are determined to have contravened police department policy, for instance.) The city had suitable procedural rules in place and the hearing officer failed to follow them, so there would be no municipal liability under section 1983. Under this interpretation of *Monell*, a local government would never be liable under section 1983, for damages, reversal by writ relief, or anything else, when its administrative tribunal unconstitutionally deprived a party of liberty or property without due process of law if, at the same time, the tribunal broke local procedural rules. The tribunal's error under local law would insulate the government from liability for the constitutional violation by proving that the tribunal was not executing a local policy.

Finally, the court cited *Farrar v. Hobby* (1992) 506 U.S. 103 (*Farrar*). It reasoned that under that case, even though Beames was a prevailing party, he should not recover attorney's fees because his "success on constitutional civil rights claims was limited." Although he obtained an order vacating the hearing officer's order, a new hearing before the hearing officer could still take place, after which Beames might have no relief at all. The court did not mention the city's concession at the merits hearing that the hearing officer's award of $45,000 in daily penalties was entirely unsupported, or the fact that it made this concession only when the litigation was complete. It also did not

28

mention the fact that, but for Beames's decision to initiate the litigation, the daily penalties would have continued accumulating and he could have been compelled to evict his tenant before the city finally changed the zoning.

Beames filed a notice of appeal on June 19, 2017.

## DISCUSSION

The only question on appeal is whether denial of the fee award was improper under section 1988. We conclude it was.

Consistent with the language of section 1988(b) ("the court, in its discretion, may allow the prevailing party"), the parties agree that the abuse of discretion standard applies to our review of the ruling. A trial court can abuse its discretion by making and relying on a factual finding not supported by substantial evidence in the record, or by making an error of law, among other ways. (*Conservatorship of Scharles* (1991) 233 Cal.App.3d 1334, 1340.) As will be seen, this appeal turns on such questions as whether Beames prevailed on a federal claim under section 1983 or, alternatively, pleaded a substantial section 1983 claim but prevailed on a state law claim based on the same facts; whether municipal liability under section 1983 could arise from the hearing officer's actions; and whether Beames's success in the litigation was too limited to support a section 1988 fee award. There does not seem to be any significant dispute between the parties about the facts relevant to these questions, so it is with errors of law that we will be concerned.

*Prevailing Party*

To obtain a fee award under section 1988, Beames had to be a "prevailing party" in an "action or proceeding to enforce a provision of" section 1983. (42 U.S.C. § 1988(b).) The parties essentially agree that Beames prevailed in the litigation. The city, however, contends that it would be error to award fees under section 1988 because what Beames prevailed on was not his section 1983 claim, but a state law claim that the hearing officer failed to abide by the municipal code.

29

In its order granting the writ petition, the trial court wrote that the city failed sufficiently to protect Beames's due process rights at the administrative hearing. But it did not explicitly state that there was a due process violation under the federal constitution. It wrote that the hearing officer's remarks showed he had a mistaken belief that he had to uphold the enforcement order in its entirety and impose daily penalties in the full authorized amount if a code violation was shown; but in reality the municipal code called upon him to exercise discretion, in light of certain factors and the interests of justice, when deciding whether to affirm or vacate the enforcement order in whole or in part and whether to order all, some, or none of the penalties sought by the city.

The court also wrote that the city violated Beames's rights when its employees failed to disclose to the hearing officer the process then ongoing of updating the zoning ordinance and its possible effect on Beames's property and the city's claim against him. This shortcoming had nothing in particular to do with the municipal code and seemed simply unfair.

How these issues might have fared in a procedural due process analysis under the 14th Amendment was not explored.

We will assume for the sake of argument that what was proved, in the trial court's view, was not the section 1983 claim Beames pleaded based on a procedural due process violation under the 14th Amendment, but a state law claim based on the municipal code. The question then is whether a sufficient section 1983 case was pleaded and whether the state law claim was strongly enough related to it to support a fee award under section 1988.

The relevant principles are set forth and applied in *Filipino Accountants Association v. State Bd. of Accountancy* (1984) 155 Cal.App.3d 1023 (*Filipino Accountants*). Business and Professions Code section 5087 authorized the Board of Accountancy to waive the certified public accountant (CPA) exam for accountants

30

certified in foreign countries with certification standards at least as high as those applied in California. The board had a long-standing practice of granting these waivers to applicants licensed in British Commonwealth countries. The plaintiff association sued the board, alleging that it had a decades-old practice of not granting waivers to accountants licensed in the Philippines, even though the licensing authority in the Philippines applied higher certification standards than the British Commonwealth authorities. The plaintiff maintained that this practice discriminated against its members based on their race and national origin, and constituted a violation of 42 United States Code section 1981 (section 1981)[8], as well as of the due process and equal protection clauses of the 14th Amendment. It also asserted that the board's discriminatory practice violated the California Constitution, Civil Code sections 51 and 52, Labor Code section 1412, and Business and Professions Code section 16721. (*Filipino Accountants, supra*, 155 Cal.App.3d at pp. 1026-1028.)

After a bench trial on the merits, the trial court issued a notice of its intended decision, in which it found that the board denied waivers to Philippines-certified applicants unlawfully from 1957 to 1977, and ordered it to reevaluate all such applications from that period under the same standards it had applied to Commonwealth applicants. The court framed the violation as an abuse of the board's discretion under Business and Professions Code section 5087 and did not mention racial or national-origin

---

[8]    Section 1981 provides in part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." Section 1988 authorizes an award of attorney's fees to a plaintiff prevailing in an action to enforce section 1981, just as with section 1983. (42 U.S.C. § 1988(b).) No reason appears why the legal analysis for a section 1988 award in a section 1981 case would differ from that in a section 1983 case.

31

discrimination, section 1981, or any provisions of the federal Constitution. (*Filipino Accountants, supra*, 155 Cal.App.3d at p. 1028.)

After the court issued this notice, the parties entered into a stipulated judgment directing the board to reevaluate the affected applications as indicated in the court's discussion. The judgment reserved the issue of attorney's fees for later proceedings. (*Filipino Accountants, supra*, 155 Cal.App.3d at p. 1028.)

The plaintiff moved for attorney's fees under both section 1988 and Code of Civil Procedure section 1021.5. The trial court granted the motion on both bases, stating: "'California Code of Civil Procedure section 1021.5 and Title 42 United States Code section 1988 provide authority for an award of attorneys' fees to petitioners. [¶] This action has resulted in the enforcement of important rights affecting the public interest. These rights include the rights of Filipino CPAs to equal protection of the laws under United States and California Constitutions; the right of such individuals to practice their profession; the right of such individuals to be free from arbitrary and capricious treatment by the Board of Accountancy; and the right of minority communities and the public generally to be served by a wide range of professionals without regard to national origin.'" (*Filipino Accountants, supra*, 155 Cal.App.3d at p. 1029, italics omitted.)

On appeal, the board challenged the fee award under section 1988 only. Despite the existence of the unchallenged alternative ground, the Court of Appeal entertained the section 1988 issue because there was at the time an unresolved legal issue about caps on Code of Civil Procedure section 1021.5 awards. (*Filipino Accountants, supra*, 155 Cal.App.3d at pp. 1029-1030.)

Citing extensive United States Supreme Court authority, the Court of Appeal distilled the following propositions:

- A plaintiff who succeeds on any significant issue and achieves some of the benefit sought in bringing suit is a prevailing party for attorney's fee purposes. (*Filipino Accountants, supra,* 155 Cal.App.3d at p. 1031.)

32

▪   A plaintiff's success need not take the form of a judgment on the section 1981 claim, or proof of any of the elements of that claim. Instead, "even where a civil rights act claim [i.e., a claim under section 1981, 1983, or any of the other statutes listed in section 1988] is litigated through judgment, a plaintiff need not prevail *on that claim* in order to be eligible for an award of fees under section 1988, provided that plaintiff's complaint has *pleaded a 'substantial' civil rights act claim* and plaintiff *prevails on* a non civil rights act claim that is factually related to the pleaded civil rights act claim." (*Filipino Accountants, supra*, 155 Cal.App.3d at p. 1032 [underlining and second and third italics added].)

▪   The bar of substantiality for the section 1981 claim that must be *pleaded* is low. The claim is substantial unless it is "'essentially fictitious,'" "'wholly insubstantial,'" "'obviously frivolous,'" or "obviously without merit." It is insubstantial only if prior decisions of the United States Supreme Court *inescapably* render it frivolous and show it to be so clearly unsound that they foreclose the subject. (*Filipino Accountants, supra*, 155 Cal.App.3d at p. 1034.)

▪   The *other* claim on which the plaintiff need have *prevailed* has an adequate factual connection with the pleaded section 1981 claim if both arose out of a common nucleus of operative fact. (*Filipino Accountants, supra*, 155 Cal.App.3d at p. 1033.)

Applying these points, the Court of Appeal held that the Filipino Accountants Association prevailed because it obtained the primary relief it sought: reevaluation of its members' applications for licensure under standards that would prevent the discrimination complained of. (*Filipino Accountants, supra,* 155 Cal.App.3d at p. 1031.) The constitutional claims pleaded under section 1981 could not be deemed insubstantial, and, in fact, "a respectable body of law supported" those claims. (*Filipino Accountants, supra,* at p. 1035.) All the claims were based on one set of facts—the discriminatory rejection of the Filipino applicants' waiver requests—so the state law claim on which the plaintiff prevailed necessarily had a nucleus of operative fact in common with the section 1981 claims. (*Filipino Accountants, supra,* at p. 1035.)

These principles apply in a straightforward way to Beames's case. First, he succeeded on a significant issue. The trial court agreed that he had a right to have the

33

hearing officer do all the following: exercise his discretion to affirm all, part, or none of the enforcement order and direct payment of all, part, or none of the daily penalties; make this determination in light of the interests of justice, the other factors listed in the municipal code, and the relevant facts, including those known to the city but not mentioned by it at the administrative hearing; and state his factual findings in writing. None of this happened, so the court found Beames was entitled to vacatur of the hearing officer's order and a new hearing conducted under the proper standards. Because of this outcome and other objectives achieved along the way, the litigation achieved essentially all of the benefit Beames sought. His stay motion caused the daily penalties to stop at $45,000, over the city's opposition. Then the order to pay $45,000 was reversed, over the city's opposition. At the merits hearing at the very end of the litigation, the city at last conceded that it had never had a reason to pursue those penalties in the first place, so there was no longer any likelihood of their being reinstated at a new administrative hearing. The litigation also allowed the status quo on Beames's property to be maintained while the city moved toward changing the zoning, so that Beames was never forced to evict his tenant, as he likely would have been had he allowed the penalties to continue accumulating instead of bringing the writ proceeding. By bringing and prosecuting the litigation, Beames caused everything to be taken off the table except the $2,800 fine imposed by the code enforcement department. And—once again, because of the litigation—it would be most surprising if the city were to attempt to collect that amount: The litigation revealed that the city's enforcement action was a waste of time, money, and aggravation from beginning to end, which would have been avoided if the city had applied its knowledge of the potential connection between the comprehensive zoning update process and the situation faced by Beames and his neighbors, and voluntarily delayed enforcement, as he urged it to do repeatedly.

34

Next, Beames's section 1983 claim was substantial. It was premised on a procedural due process claim based on the 14th Amendment's due process clause, and directed at the deficiencies of the administrative hearing. It alleged that the hearing was not fair because the hearing officer did not make findings of fact, consider whether his order was in the interests of justice, or consider other relevant factors, even though these things were or should have been routine for him, and was unaware of the discretion vested in him to craft a suitable order.

The threshold inquiry for a 14th Amendment procedural due process claim is whether the governmental action complained of deprived the claimant of an interest in liberty or property within the meaning of the due process clause. (*Mathews v. Eldridge* (1976) 424 U.S. 319, 332 (*Mathews*).) The hearing officer's order, if upheld, would have deprived Beames of $45,000 and forced him to evict his tenant and limit the use of his property. It is difficult to argue an interest in property was not at stake.

After the threshold, the next question would be whether the procedural benefits Beames did not receive (findings of fact, consideration of the interests of justice and other factors, exercise by the hearing officer of his discretion, disclosure of relevant facts in possession of city personnel) were "due." This is determined by a balancing test that takes account of the benefit to the claimant and the burden on the government of adding procedures. (*Mathews, supra*, 424 U.S. at pp. 339-349.)

The question of what process is due was not explored in the trial court, but it need not have been explored for us to determine that the section 1983 claim was substantial. In *Filipino Accountants*, establishment of the equal protection claim would have required proof of intentional discrimination, for example. The plaintiff did not establish even a prima facie case of that element, but this did not mean the claim was insubstantial. (*Filipino Accountants*, *supra*, 155 Cal.App.3d at pp. 1031-1032.) It is the same here. Beames does not have to show he proved or could have proved a procedural due process

violation under the balancing test of *Mathews*. It is enough to say that no clearly established law would dictate a result adverse to him.

Finally, there is no difficulty regarding the factual relationship. Beames's state law claims and his claims under section 1983 were alternative theories, based on the same set of facts, for obtaining relief from the hearing officer's order.

For the above reasons, Beames pleaded a substantial section 1983 claim and prevailed on a state law claim based on the same facts as the section 1983 claim. There was no other sense in which he had to be a prevailing plaintiff for purposes of section 1988.

> "The purpose of [section] 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances. [Citation.] Accordingly, a prevailing plaintiff "''should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'''" (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 430.)

There were no special circumstances that would render a fee award unjust and no reason why what "ordinarily" happens should not happen here. In fact, as illustrated in the discussion below of the public interest in or public good done by the successful litigation, the circumstances support the justice of a fee award strongly in this case. Beames established a right to recover attorney's fees under section 1988 and the trial court abused its discretion in denying his fee motion.

### *Public Purpose, Interest, or Good*

The city's treatment of Beames was not in the public's interest or welfare. It expended public resources first to sanction a citizen by means of a poorly managed and unlawful administrative hearing, and then continued the exercise by forcing him to litigate against the results of the hearing long after the city should have known that this served no legitimate purpose.

The tendency of litigation to promote the public interest or provide a public good by discouraging unlawful behavior is a factor that can help support an award of attorney's

fees. This proposition, which we will discuss further momentarily, survives the holding in *Farrar*, in which the United States Supreme Court held that although a nominal or technical remedy suffices to make a plaintiff a prevailing party, it usually will not suffice to support a section 1988 fee award, because it represents such an extremely limited degree of success. The plaintiff in *Farrar* sued state officials under section 1983 on a due process theory on account of the manner in which they closed down his private school after he was indicted for murdering a student by willfully denying medical treatment. He proved a due process violation and thus prevailed, but it was determined that he was uninjured by the violation and he received nothing but nominal damages of one dollar. (*Farrar, supra*, 506 U.S. at pp. 105-106.) The case "accomplished little beyond giving [the administrators of the estate of the plaintiff, who had died] 'the moral satisfaction of knowing that a federal court concluded that [their] rights had been violated' in some unspecified way." (*Id.* at p. 114.)

It might be thought, at least where no substantial remedy is awarded, that this holding means a prevailing party cannot be awarded fees based only on the fact that the result could serve to benefit the public by deterring future violations. But the holding of *Farrar* does not actually imply this. The Supreme Court made the point that fees should not be awarded unless the litigation achieved the plaintiff's goal of obtaining compensation (or, presumably, in a non-damages case, some other materially corrective remedy) for injury. (*Farrar, supra*, 506 U.S. at p .114.) But Farrar was not injured (his school would have been closed regardless) and neither the one dollar nor the bare favorable ruling of an "unspecified" violation compensated his estate, even though the nominal award did "vindicate his 'absolute' right to procedural due process through enforcement of a judgment against the defendant." (*Id.* at p. 115.) The line between concrete "compensation" for an injury and abstract "vindication" of a right may be thin, but we think it is tolerably clear that concrete compensation can come in the form of the

37

promotion of the public welfare.  Some plaintiffs who can prove a violation, but not an injury remediable by a personal award to themselves, may have as their primary litigation goals the creation of a deterrent to future bad governmental conduct and the precedential provision of an avenue of relief for others who *are* concretely injured by the same type of violation.  And litigation sometimes achieves those goals.  They were not the goals of Farrar, who wanted $17 million but got just one dollar and a judgment of "some unspecified" due process violation.  (*Id.* at p. 114.)  But it would take a stingy view of human motivations to say a benefit to the public never compensates an individual for a harm.

In a concurring opinion in *Farrar*, Justice O'Connor pointed out that the majority opinion did not exclude the possibility of a fee award based on the public importance of the litigation's outcome even when the remedy awarded to the plaintiff is nominal or technical.  "Nominal relief does not necessarily a nominal victory make," she wrote. (*Farrar*, *supra*, 506 U.S. at p. 121 (Conc. Opn. of O'Connor, J.).) Consequently, "the courts also must look to other factors" (*ibid.*) than the substantiality of the remedy conferred on the plaintiff by the judgment.  "One is the significance of the legal issue on which the plaintiff claims to have prevailed."  (*Ibid.*)  Even Farrar might have been deemed to have had material success if his victory had "also accomplished some public goal."  (*Id*. at pp. 121-122.)  Section 1988 was not enacted to create employment opportunities for lawyers, but it does function as "a tool that ensures the vindication of important rights, even when large sums of money are not at stake, by making attorney's fees available under a private attorney general theory."  (*Farrar*, *supra*, at p. 122.)  The difficulty for Farrar was simply that even with a judgment in his favor, no discernible public goal was accomplished and no significant legal issue was resolved or elucidated, so there was nothing to place in the scales to weigh in favor of a fee award except that one dollar in damages.  (*Id.* at pp. 121-122.)

*Brandau v. State of Kansas* (10th Cir. 1999) 168 F.3d 1179 (*Brandau*) is an example of Justice O'Connor's point in action. The fee provision at issue was not section 1988 but was instead 42 United States Code section 2000e-5(k), a portion of the Title VII of the Civil Rights Act of 1964; the applicable principles are the same. Brandau obtained a judgment against her state government employer on a hostile environment sexual harassment claim. The jury rejected her claim for 21 months' back pay plus $50,000 in compensatory non-economic damages. It awarded her only nominal damages of one dollar, but the district court granted her motion for attorney's fees. (*Brandau, supra*, at pp. 1180-1181.)

The Court of Appeal affirmed the fee award, holding that it was consistent with *Farrar*. Unlike Farrar, Brandau did not make an extravagant damages claim, so her nominal award did not represent an equally dramatic failure to recover what she sought. Further, the claim on which she succeeded, sexual harassment, was her primary claim; the claims for retaliation and constructive discharge on which she did not succeed were secondary. Most importantly for our purposes here, the judgment in her favor served the public interest. It was shown that her state government employer had little capacity for the proper handling and investigation of sexual harassment claims. The judgment placed the employer and the state on notice regarding their responsibility for educating and training their employees and supervisors about sexual harassment, and the need for them to reform their policies on the subject; and it served as a warning to take steps to reduce their exposure to liability lest compensatory damages be proved in the next case. Unlike in *Farrar*, the judgment told the defendants just what the violation was. It was not a victory from which the plaintiff derived nothing of consequence but the status of winner. Instead, the vindication of rights under Title VII and the benefit to all the other employees of the state employer—and indeed to the state employer itself—were "in the interests of the public and are exactly what Congress intended to encourage" via fee

39

provisions in the Civil Rights Act of 1964. (*Brandau, supra*, 168 F.3d at p. 1183.) We do not think the intent of section 1988 is any different in this regard.

In our case, there is no difficulty about the substantiality of the material relief obtained through the litigation. Beames did receive very material benefits from the litigation, as we have indicated and will elaborate further below in rejecting the city's argument that his success was limited. He got virtually all he sought. So the question for us is not whether the publicly beneficial result of the litigation is sufficient to fill in for a paucity in the concrete recovery obtained. Instead, it is whether the public benefits add significant heft to the claim for attorney's fees (although in our view the case is already strong enough under the *Filipino Accountants* analysis above, given the concrete recovery) and provide additional justification for reversing the trial court's denial. We conclude they do. Even if *Farrar* did mean (as it does not) that nominal or technical relief plus a publicly beneficial holding always amounts to no case for attorney's fees, still nothing in the Supreme Court's opinion would suggest that the public good or public interest will not strengthen a case for fees that is supported by the magnitude of the recovery as well.

We now turn to the question of exactly what public benefits this litigation has achieved. As we have already indicated, the city's own counsel ultimately informed the court that the city began making the connections between Beames's property, the Ben Maddox Way situation more generally, and the comprehensive zoning update at the time it investigated the complaint about Beames's property, back at the beginning of the whole process. The city proceeded to order Beames to terminate the business on his property anyway. His unaided attempts to gain time to work at inducing the city to solve the Ben Maddox Way problem via the comprehensive zoning update—the approach the city had already been considering and that it used in the end—were rebuffed by the very personnel who were most intimately associated with the update. At the administrative appeal

hearing, the city committed the violations that later became the heart of the litigation: It failed to disclose to the hearing officer the information about those connections between the property and the update, and what it had started to consider doing about them; and the hearing officer demonstrated that he would not have understood his obligation to consider that information, or any other relevant evidence besides the code violation itself, even if it had been presented to him. Nor was he aware of the factors in light of which he was required to consider evidence, or of the range of possible rulings open to him after he considered it. And Beames's reiterated request for time to link the Ben Maddox Way problem to the update was again dismissed out of hand at the administrative hearing in the presence of the same city personnel. The unfairness of the proceeding may or may not have been unconstitutional, but its unlawfulness was established by the trial court's ruling after the merits hearing, is clear, and is not now in dispute.

By the time Beames filed his writ petition months later, city planning staff had already put a proposal before the planning commission that would have led to the legalization of Beames's tenant's business and to a solution to the Ben Maddox Way problem in general. At that time the city had no articulable reason for pursuing enforcement, and could not gain anything by continuing its enforcement efforts through counsel that it could not gain at no cost by delaying. Yet counsel took the most adversarial course available, opposing Beames's motion to stay the accumulation of penalties at $500 per day, while at the same time trying to claim the moral high ground and imputing base motives to Beames.

Meanwhile, the comprehensive rezoning ordinance process continued, with never a word about it from the city's counsel to Beames or the court. When the merits hearing finally rolled around, the process was so close to a consummation in Beames's favor that the city was cornered and had to concede there never was any justification for the daily penalties it had insisted on at every stage. It also had to concede that the underlying

41

substantive issue—the use of the property—was almost certain to drop out of the case in a month.  Still the city refused to give even a millimeter.  It did not offer to stipulate to any limitations on the ruling it was seeking, not even with respect to the $45,000 in penalties it had just admitted were unsupported.  The court observed that there was little left to the case.  It suggested settlement.  The city never budged.

There was no reason for any of this.  At every opportunity to ameliorate the situation, the city seemingly chose to make matters worse.  And after the administrative hearing—when the city's conduct forced Beames to go to court—the city only got more aggressive.

Government should not be allowed to intentionally inflict a situation such as this on one of its citizens.  Hopefully our opinion in this case will lead to lawful administrative hearings presided over by hearing officers cognizant of their duty and attended by knowledgeable city personnel prepared to fully explain  the situation in its entirety.

*Municipal Liability*

This section and the next two are provided in rebuttal to the counterarguments advanced by the city.

The trial court and the city have asserted, in effect, that Beames did not plead a substantial section 1983 case because section 1983 liability is rendered impossible here by *Monell, supra,* 436 U.S. 658.  This, they assert, is because the hearing officer on whose conduct Beames's case is primarily based was simply making mistakes at the administrative hearing, not executing city policy.  In fact, he was violating city policy by failing to follow the rules for administrative hearings delineated in the municipal code.  They say *Monell* permits the actions of a municipal employee or agent to form a basis of section 1983 liability for the municipality itself only when the employee or agent is

42

carrying out some kind of policy, practice, or pattern of behavior that can properly be attributed to the city, instead of just acting unlawfully on his or her own.

As we will explain, this reasoning does not apply to the situation before us. In his challenged actions, the hearing officer was the official maker of the city's final decision in the matter, subject to reversal only in court. The United States Supreme Court has held that an official act of such a person can be a predicate of a government entity's section 1983 liability even if it is anomalous, irregular, inconsistent with other official pronouncements and only happens one time. (*Pembaur v. City of Cincinnati* (1986) 475 U.S. 469, 471 (*Pembaur*).)

Section 1983 creates a civil cause of action for deprivation of constitutional rights by a defendant acting under color of state authority. When the defendant is a government, and the deprivation takes the form of a final decision of a government official authorized to make the decision, it would be absurd to say the government has not committed a constitutional violation under color of its own authority.

In *Monell*, a class of female employees of the New York City Department of Social Services and New York City Board of Education (an independent school district) sued the city and the board under section 1983, alleging that they had policies compelling pregnant employees to take unpaid leaves of absence before their pregnancies made such leaves medically necessary. The question before the United States Supreme Court was whether and under what circumstances a local government is a "person" subject to suit under section 1983 ("[e]very person who, under color of any statute."). (*Monell, supra*, 436 U.S. at pp. 660-663.)

Justice Brennan wrote for the court that the intent of Congress in enacting section 1983 as part of the Civil Rights Act of 1871 was that local governments can be sued directly under the statute where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially

43

adopted and promulgated by that body's officers," or is done pursuant to a settled governmental custom never officially promulgated. (*Monell, supra*, 436 U.S. at p. 690.) But where an agent or employee of the government who violated a plaintiff's rights did not do so in accordance with a settled governmental custom or an official policy, the government would not be liable under section 1983. The agency relationship alone could not create vicarious liability. (*Monell, supra*, at p. 692.) Applying this rule, the Supreme Court reversed the Court of Appeals' holding that the government entity defendants were wholly immune from suit under section 1983. (*Monell, supra*, at pp. 663, 701.)

The way the court framed the matter in *Monell* could easily enough be thought to mean there is no municipal liability unless a *rule* is first made and then the government's agent engages in action following the rule. But in *Pembaur,* the Supreme Court granted certiorari to decide "whether, and in what circumstances, a decision by municipal policymakers on a single occasion may satisfy" *Monell.* (*Pembaur*, *supra*, 475 U.S. at p. 471.)

Pembaur was a doctor suspected of fraudulently receiving public benefits payments for services not actually provided to patients. The Hamilton County prosecutor initiated an investigation, leading to the impaneling of a grand jury and the issuance of an indictment. During the investigation, the grand jury issued subpoenas for two of Pembaur's employees. They failed to appear, and the county prosecutor obtained arrest warrants.

Deputy sheriffs appeared in Pembaur's waiting room with the warrants, but he closed and locked the door to the inner office and refused to let them in. The deputies decided to wait for the police department to assist. Police officers arrived and tried to persuade Pembaur to cooperate. When he did not, they called in a superior police officer, who had no better luck. The deputy sheriffs called their supervisor, who told them to call the assistant prosecutor running the grand jury and follow his instructions. He in turn

44

called the county prosecutor, who gave the order to go in by force. The deputies chopped the door down with an axe, conducted a search, and detained two people who, however, turned out not to be the subpoenaed witnesses. (*Pembaur, supra*, 475 U.S. at pp. 471-473.)

Pembaur sued the city and county and a variety of officials and police officers under section 1983, arguing that a police search of a home or business without a *search* warrant or applicable exception violated the Fourth Amendment even if the officers had a valid *arrest* warrant for a third party. That proposition was upheld by the Supreme Court in another case while Pembaur's case was pending, and by the time Pembaur's case was set to be decided in the Supreme Court, the only question was whether the county would escape liability because neither the sheriff's department nor the county prosecutor or his office were following any relevant preexisting policy, and the search was instead the result of an official's single, discrete decision on the occasion in question. (*Pembaur, supra*, 475 U.S. at pp. 473-477.)

Justice Brennan, again writing for the court, explained that the central point of *Monell* was that municipal liability under section 1983 could be based only on acts that were truly acts *of* the municipality, not acts fictitiously attributed to it via a doctrine of vicarious liability like respondeat superior: "that is, acts which the municipality has officially sanctioned or ordered." (*Pembaur, supra*, 475 U.S. at pp. 479-480.)

The court continued:

> "With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under [section] 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy. [Citations.] But the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell*'s language makes clear that it expressly

45

envisioned other officials 'whose acts or edicts may fairly be said to represent official policy,' [citation] and whose decisions therefore may give rise to municipal liability under [section] 1983.

"Indeed, any other conclusion would be inconsistent with the principles underlying [section] 1983.  To be sure, 'official policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time.  That was the case in *Monell* itself, which involved a written rule requiring pregnant employees to take unpaid leaves of absence before such leaves were medically necessary.  However … a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations.  If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood.  More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.  To deny compensation to the victim would therefore be contrary to the fundamental purpose of [section] 1983." (*Pembaur, supra*, 475 U.S. at pp. 480-481.)

The court was at pains to explain that it did not mean every discretionary decision made by a municipal employee, even a policymaking employee, could be a foundation of municipal liability under section 1983.  Instead, the decision must be made by an official who "possesses final authority to establish municipal policy with respect to the action ordered." (*Pembaur, supra*, 475 U.S. at pp. 481-482.)  But what is policy if, as the court stated, it need not consist of plans or rules intended to control future actions or decisions?  It is "a deliberate choice to follow a course of action … made from among various alternatives." (*Id.* at p. 483.)  So if an official deliberately chooses a course of action from among alternatives and is vested with final authority to make that choice, then the choice the official makes can be a basis of municipal liability under section 1983.

The court concluded that, under this standard, section 1983 liability was not barred by *Monell.*  The sheriff's department told the deputies to follow the instructions of the prosecutor's office, and the county prosecutor made the decision to order them to enter

the doctor's office forcibly and search it. This decision was not pursuant to any rule or plan that had been followed in the past and was not meant to establish any rule to guide action in the future. But it was the final decision, chosen from possible alternatives by an official with authority to make it. So the county was exposed to liability. (*Pembaur, supra,* 475 U.S. at pp. 484-485.)

Beames's case is straightforwardly analogous. Tromborg, the hearing officer, was vested with the authority to make the city's final decision on whether to uphold, modify, or vacate the code enforcement order, whether to impose penalties, and how much the penalties would be. He was the end of the road so far as city policy was concerned: After his decision the next step was litigation.[9] His decision was chosen from among alternatives, and such a decision made by such a city official was city "policy" under *Pembaur. Monell* thus is consistent with section 1983 liability in this case, and consequently does not show Beames failed to plead a "substantial" section 1983 case.

### *Limited Success*

The trial court also relied on *Farrar* in denying the fee motion, and the city cites that case now.[10] If anything, however, *Farrar* supports an award of attorney's fees in this case.

---

[9] The 30-day notice sent by the code enforcement officer to Beames on February 10, 2016, explained that he was entitled to an administrative appeal before a hearing officer, and that absent success on appeal or upon the expiration of time to appeal, the enforcement order would become final. "There are no appeals to City Council," the notice stated, and Beames's recourse would be to seek review in the superior court. After the administrative hearing, Beames was given a notice stating that the enforcement order was now final and Beames had a right to seek review in court, but the city had the right to perform abatement at Beames's expense immediately.

[10] The city's only attempt to utilize *Farrar* in its appellate brief is a quotation that is presented awkwardly, out of context, and fails to support the city's point. The brief states: "[W]hen a trial court finds a violation of procedural due process, that finding 'obligates a court to award nominal damages when a plaintiff establishes a violation of his right to procedural due process but cannot prove actual injury.' (*Farrar*[, *supra*,] 506

*Farrar* merely stands for the proposition that, in a damages action under section 1983, a plaintiff who recovers any damages, even nominal damages of one dollar, is a prevailing plaintiff under section 1988, but a plaintiff receiving only a nominal damages recovery or some other merely technical remedy standing alone, being essentially uninjured, will often be entitled to no attorney's fees at all under section 1988. And in general, the degree of a plaintiff's success in obtaining the relief sought is the most

U.S. [at p. 112], citing to *Carey v. Piphus* (1978) 435 U.S. 247, 266.)" The trial court here did not expressly find a violation of procedural due process and did not award any form of damages. The city invites the reader to infer that the absence of a damages remedy in this case proves there was no procedural due process violation; consequently there was no section 1983 violation and no basis for an award of section 1988 attorney's fees.

In reality, the Supreme Court in *Farrar* stated: "Thus, *Carey* obligates a court to award nominal damages when a plaintiff establishes the violation of his right to procedural due process but cannot prove actual injury." (*Farrar, supra,* 506 U.S. at p. 112.) *Carey* simply held that *in a damages action* brought under section 1983 and premised on a procedural due process violation, where the plaintiff proves a violation but no damages, the correct outcome is a judgment for the plaintiff declaring the defendant's liability but awarding only nominal damages not to exceed one dollar. (*Carey, supra*, 435 U.S. at pp. 248, 266-267.) In other words, such a plaintiff should not be awarded unproved compensatory damages but also should not be denied a judgment in his or her favor.

It is obvious that neither *Farrar* nor *Carey* held that there is no such thing as a procedural due process violation, or a section 1983 violation, where the remedy is something other than damages. In fact, section 1983 expressly authorizes "an action at law, suit in equity, or other proper proceeding for redress." "Action at law" is a traditional name for a lawsuit praying for money damages. A "suit in equity" in modern terms means one in which an equitable remedy, such as an injunction, is sought. The mandamus proceeding here is "[an]other proper proceeding for redress" in the form of a writ of mandate directing the administrative tribunal to vacate its order.

In any event, as we have said, there need not be a judgment that federal law has been violated to support an award of attorney's fees under section 1983. Instead, the plaintiff must have prevailed on a significant issue and pleaded a substantial section 1983 claim based on a nucleus of operative facts common to it and the issue on which the plaintiff prevailed.

48

critical factor in determining the amount of attorney's fees a prevailing plaintiff should be awarded under section 1988. (*Farrar, supra*, 506 U.S. at pp. 111-116.)

The trial court suggested *Farrar* undermined the fee motion because Beames could end up getting no relief after a new hearing before the hearing officer. But this overlooks the facts discussed above: Beames's successful motion for a stay on accumulation of penalties removed the danger that he would be compelled to protect his finances and keep a lien from being placed on the property by evicting his tenant before the city got finished legalizing the use. And at the merits hearing, the city conceded that Beames's use would soon be legalized and the daily penalties were improper in their entirety, thus severely constraining the scope of any favorable ruling the city might obtain at a new administrative hearing.

In other words, the trial court was mistaken about the practical consequences of its own rulings. There was no realistic possibility of a new administrative ruling resulting in no relief for Beames. Instead, because he litigated, Beames was substantially relieved of the burdens the city had placed on him, and there was no prospect of any significant part of them being reimposed. Leaving aside the $2,800 fine, Beames obtained all he sought. He defeated the city's bid to force him to evict his tenant or pay $500 for each day after the administrative hearing. If *Farrar* means significant material relief is usually a prerequisite of a section 1988 fee award, then this case passes *Farrar*'s test with flying colors.

It could have been (but was not) argued on the city's behalf that if Beames had confined himself to speaking at city council and planning commission meetings instead of filing his writ petition, the final outcome would have been the same: His property use would still have been legalized by the city council and the city would still ultimately have reached the conclusion that the daily penalties were unjustified under the circumstances.

49

So in the end, the litigation brought him out in the same position where he would have been without it.

But this would overlook the risk Beames faced. He was under threat of losing his tenant plus $500 a day until the tenant was gone. Had he decided to comply with the administrative order instead of suing, the rational course would have been to comply promptly to minimize the daily penalties. But then he would have lost his tenant, which no doubt would have been costly to him. So not suing would have led Beames to a worse position than the position he arrived at by suing, even if the land use had still been legalized and the penalties lifted in the end.

There is no sound "limited success" rationale for denying Beames's fee motion.

*Assorted Arguments*

The city's final arguments are made in a short section of its brief titled "Enforcing the Law Is Not Made Unconstitutional Just Because Changes to It Are Being Considered." (Unnecessary capitalization omitted.) Several arguments are made in this section:

> "[T]here was never a claim in the court below that [Beames's] use of the subject property was lawful from the time he was cited through judgment."

> There is "no authority to support the proposition that a law becomes unenforceable when changes to it are merely being considered."

> "[T]he trial court never said the result had to be different just because the rezone effort was underway or about to get underway."

> "City's position about [Beames's] land use was not disputed in the court below or here: [Beames] was operating his towing business outside the local zoning law, and failed to take steps necessary to cure that problem."

The theme of this section of the city's brief seems to be that attorney's fees should not be awarded because the city did nothing wrong, and the city did nothing wrong because the property was in violation. But what the city did wrong, of course, was fail to

50

conduct the administrative hearing properly in the ways the trial court discussed, necessitating Beames's self-defensive legal action and leading the city to inflict the additional unnecessary harms we have discussed.

What then *is* the significance of the undisputed zoning violation in this case? It means that *under completely different circumstances* the city would have done nothing wrong. If the city had never begun to form any plan to change the zoning and eliminate the problem, or had disclosed such a prospect to the hearing officer; if the hearing officer had followed the rules, learned of and considered the facts, and understood and exercised his discretion; if the city had not managed its side of the litigation as though the circumstances *were* completely different from what it knew them to be, then—assuming the claim of intentionally discriminatory enforcement would have turned out to be unsupported—Beames would have been without recourse on the merits or the fees issue. But this is not what happened. The undisputed zoning violation did not excuse this conduct, and does not defeat the fee motion.

The city also objects here to Beames's characterization in his brief of the city's behavior in the matter as "bad faith." Bad faith as a legal concept is not relevant to any part of the analysis in this case, so we need not address it. What is relevant is a point we have been making throughout this opinion: By the time the litigation commenced, the city knew the status of Beames's property and neighboring properties was before it as a legislative matter that would be resolved soon, very possibly in a manner that would remove any reason for proceeding against Beames. In the city's own view, as it eventually acknowledged, this meant the daily fines were not justified at any stage. Daily fines serve to deter the continuation of a prohibited use; but the city had no interest in deterring that which it was preparing to allow. It was always possible that it would end up deciding not to allow it, and that possibility could have justified a decision to seek to stay the litigation instead of settling it on terms favorable to Beames or stipulating to

51

judgment in his favor. But proceeding against him in court full steam ahead was not an appropriate use of municipal authority.

And that is where the public interest/deterrence part of the support for an award of attorney's fees in this case comes in. The subject matter of the litigation—the hearing officer's defective ruling—came to be because the city did not apprise its own hearing officer of some of the most salient facts, and its hearing officer acted without an adequate understanding of his own authority, or of what factors his decision should be based on. By the time the litigation began, the city was in possession of enough of the full picture to understand that this was not going to be a simple code enforcement matter in which proof of the violation meant the property owner's cause was lost—and that rapidly developing events could mean the city's reasons for going after the property owner could soon disappear entirely. The city did not even pause to see whether the matter could be resolved. Instead it opposed his motion to stay the accumulation of penalties.

The city's appellate brief says: "City was sued in administrative mandamus and defended the action. [Beames] would have this Court call that bad faith; most lawyers call it mounting a defense." Under these circumstances, we would call it something a bit more complicated. It was needless litigiousness in defense of an unlawful administrative order the city finally conceded was indefensible even as it continued to defend it with no prospect of meaningful gain in sight.

In this litigation, the city failed to provide its citizen with a lawful administrative hearing, and when the citizen sought redress, the city proceeded to victimize him for nothing, running up litigation costs on both sides. This falls within the class of governmental abuses a section 1988 attorney's fee award can serve to deter.

*Post-judgment Demurrer*

Along with its appellate briefs, the city filed a motion for judgment on the pleadings, which it also calls a demurrer, asserting that Beames failed to plead a cause of

52

action under section 1983 and for that reason could not recover attorney's fees under section 1988. A motion for judgment on the pleadings can be filed at any time (even if a demurrer cannot). (*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 259-260.)

The city argues that Beames did not plead a cause of action under section 1983 because he did not plead facts that would show the hearing officer committed his errors in accordance with a municipal policy or custom as these terms are defined in *Monell.* We have already explained that the issue of municipal policy is controlled in this case by *Pembaur.* Under *Pembaur*, there was no need to plead a preexisting policy or custom because the hearing officer's decisions themselves sufficed to support municipal liability.

"'[I]t is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory.'" (*Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597, 603.) Demurrers and motions for judgment on the pleadings are functionally equivalent. (*Dudley, supra,* 90 Cal.App.4th at pp. 259-260.)

The city has not shown that Beames failed to state a cause of action under any possible legal theory. If the city filed a demurrer, it is overruled; if a motion for judgment on the pleadings, it is denied. The associated request for judicial notice, which pertains only to material already in the record or briefs, is denied as moot. We have considered these materials and judicial notice of them is unnecessary.

*Conclusion*

The enforcement machinery in this case was put in motion by a complaint and never slowed despite the knowledge of the involved personnel that a legislative solution could be coming, and then was coming, based on the city's decision that it did not want to eliminate the affected land use after all. The administrative hearing process failed to reveal and deploy this knowledge to rational ends because, operating in contravention of

53

municipal law, it was nothing more than a rubber stamp. It acted as if its role were not to resolve disputes but to close cases, not to find facts but to check boxes. Compounding matters, city personnel did not disclose the relevant facts to it anyway. The litigation phase, forced on Beames by the unlawful administrative hearing, was conducted coldly on the city's side, to the disadvantage of all. All the involved personnel behaved at each stage as though there were simply no decisions to be made and no judgment to be exercised by them.

A fee award would have been called for under section 1988 even if the course of events had not been such an object lesson. The section 1983 claim would still have been "substantial" and that claim and the state law claim based on the municipal code would still have had a common nucleus of operative facts.

## DISPOSITION

The order denying the motion for attorney's fees is reversed. The matter is remanded to the trial court, which is directed to determine a reasonable fee and grant the motion.

_____

SMITH, J.

WE CONCUR:


_____

POOCHIGIAN, Acting P.J.


_____

MEEHAN, J.